May I proceed, Your Honor? Yes, sir. Go ahead. May it please the Court? The Honor, Yvonne Demarce worked for the Horseshoe Casino for ten years. Everybody agreed she was an outstanding dealer. I don't know. She may have been an outstanding dealer. Apparently, she had attendance problems before any of this. Yes, ma'am. And they were all related to a variety of serious medical conditions that she had. There's no evidence she had any attendance problems that was not related to a serious medical condition of some kind. And the reason given by the defendants for terminating her was that she ultimately ceded their ten-point system, that they had a system of points, and if you go over the ten points, then you're terminated. There are two theories for which we believe they violated the American Disabilities Act, or at least the jury should have been allowed to find they violated the American Disabilities Act. And the first one is that the system that they used was inherently discriminatory against a person with a disability. Specifically, what had happened in, as of February of 2010, she had a doctor's notation that she could only work sitting down. She couldn't stand up at a stand-up table. They had a few tables there where the dealer could sit down, and because of her osteoarthritis, she could not stand up, according to the physician, to work. She had to be allowed to sit down throughout her shift. The company adopted a policy when they had that doctor's note that if business is slow, and you have to be sent home if business is slow at your pit, the pit where her table was located would sometimes close because business was slow. And the company had a policy that applied generally that when business is slow, then we send dealers home. And they had a system for sending them home, but as pertaining to her, once her table closes, then she's sent home, and normally she gets an attendance point for being sent home. Let me ask you something with respect to the other employees. When business was slow and they were sent home, let's say you get sent home, I don't know how these places work, but let's say you show up for work and you work three hours, and business is slow, so you get sent home. Do you get paid for the other five hours in an eight-hour day, or do you, are you? Your Honor, I'm afraid this is a really huge record. I don't think there's any evidence in that in the record on whether you get paid or not. The evidence was that you are sent home, though, without penalty. You aren't assessed a point. You don't get an attendance point. You're sent home for business reasons. Now, whether they got paid or not, I It's whether they got paid or not? As to whether they got paid or not, because Well, Your Honor, I don't know that it is, because they haven't, normally it's a voluntary thing. They have an early out list. Some people don't want to work before she or after want to get off, and they sign an early out list, and the normal practice was you get sent home in the order in which you sign the early out list. Okay. Now, if you sign the early out list, do you get, you don't get paid, or what? Your Honor, I'm sorry. I don't know whether, I don't think the record reflects that. Our case was not based, I mean, there's no, I don't think there's any evidence on whether they got paid or not. I would assume they, I don't know. It depends on whether they were salaried or The whole case has been predicated on these points and all that business, and I was just curious, because it makes a difference. I mean, if you're trying to earn a living, put bread on the table, feed your kids, what happens when you get sent home, and whether you get paid or not for the rest of the day is important to someone trying to pay the bills, I would think. But anyway, it's not in your case, as you've teed it up. The other thing we're saying, Your Honor, is she was treated differently from the employees who would be sent home simply for business reasons. That is, she would get a point. Now, the defendants answer that. Here's their answer to that. They say that, well, she could have signed the early out list, and if she were the first person on the early out list, that is, she could have been the first person to sign the early out list, and if she had done that according to them, well, she wouldn't have gotten a point. But even that system penalized her, because if you sign the early out list, in the first place, if she does that, they take that away from her family and medical leave act. She's in bad shape. She needs to be able to call in sick when she's unable to come to work, but she can't do that. She didn't have any family and medical leave. If she signs out, that day counts against her family and medical leave, so she's penalized for it. So they are not penalized. It doesn't count against the person that just has a business reason for going home, so she's treated differently from those people that have a business reason for being sent home early. Wasn't she offered a shift switch? Wasn't she offered to be able to work at the table that's open 24 hours a day? No, ma'am, and this is something I just can't emphasize this enough, Your Honor. The statements in that brief, to that effect, are just not in the record. If Your Honor look over at page 20, these statements, whether they say that or not, are not in the record. In fact, just the opposite is in the record. On page 20 of their brief, I'd invite the Court to look at there and the record sites they make, and also on pages 5 of their brief, these statements that she was offered, these shifts, although it starts out, Robinson proposed. Well, Robinson proposed nothing. All the accommodations were proposed by her, according to the record. They didn't propose anything, except, you know, they proposed this. You go home early when your shifts can't work. But I'm reading on page 20 of their brief. Robinson proposed. False. Never proposed anything. One, learning to deal another sit-down game that did not close. False. If you look on page 9 of my brief, it cites the, you know, I quote her on what she said about another game. I quote her testimony. That's the testimony that's in the record about it. What she said happened is that she asked them, I need to learn another game, the mini-bat game. I mean, I'm like your Honor, I don't do any gambling, except for this. But she said, I need to learn another mini-bat game. One of the pit bosses allowed her to do that one night, to try to go work another game and have a dealer look over. The next night, she says she tried to do the same thing, and the dealer said, no, we're not doing that. You can't learn on the clock. We're not allowing you to do that. So there's nothing in there that . . . Let me tell you this, Your Honor. There is another point in the record where something entirely different is being discussed, and the question is asked, something to the effect was about working off the clock or coming in to work off the clock. And she does say, yes, at some point, they mentioned to me, I could come in and work, not be paid and work. But there's no context to that. We don't know whether that had anything to do with this, you know, this particular effort to keep her job or when that happened. She just says that at some point, one of the pit bosses told her or somebody told her, you can come in and work for free and learn, that somebody did tell her. Not work, but shadow the gambler that was in charge of that game she was trying to learn. That's what she was trying to do. That's what she suggested. Well, she wanted to be paid for it. They said, no, you can do it, but you're not going to be paid. Your Honor, in all fairness, I don't really think that's a . . . it would be, in my opinion, up to a jury to decide here exactly what happened. But in all fairness, from her point of view, that she asked to work this other game, and they said, no. As far as learning that other game, she was asked at some point during this very lengthy deposition, at some time, didn't they tell you that you could work without being paid, that you could learn off the clock? And she said, yes. But what I'm saying is, there's just no context to that about when did that happen. Did that happen five years ago? Or when did that happen? Did that have anything to do with the situation we were here about? It's just totally out of context. And what I'm trying to say to the Court, that whether they offered her a reasonable accommodation, is a question of fact for the jury. And then the last one, when it says shifting . . . changing to a shift where the game did not close, she testified . . . she testified about that, and she said that when she got the shift that she got, the sit-down shift, she specifically asked them, which shift should I take? And they said, it makes no difference. You're going to be accommodated on whatever shift she takes. And then she . . . But I thought she turned down that shift because she and her husband wanted to be off on the weekends. No, ma'am. I think Your Honor gets that because of the way they write the brief. That's the only way I get things. That's not . . . From the record sites in the brief. Yes, ma'am, and it's not right. I just urge Your Honor to look at the record. I mean, what they say in the brief is not supported by the record. She testified that when she chose . . . she and her husband chose the shift that they chose, she says she asked them, you know, I want to do what . . . I can accommodate my disability, and they told her it doesn't make any difference which shift. And she gave a number of reasons for choosing the shift that she and her husband chose. One, so they could be together, and she did say they wanted to be together on weekends, but it was also the shift that she calculated she could get the most hours on it. She was least likely to be sent home. Not if it closed. The 24-hour table didn't close. She chose the table that might close if there aren't enough patrons in there. She chose that shift. She could have chosen to work the 24-hour table that never closes. Your Honor, I don't think there's any evidence in there about any particular table never . . . she says there's a particular pit where it doesn't close, but I don't . . . that's another thing I don't think there's any evidence of. I don't think there's any evidence of if there's a sit-down table that never closes. She does refer to that it would help me if I could work this mini back . . . I think I'm pronouncing that right. It's a sit-down table, and she testifies about that. But she didn't know that game, even though she'd been a dealer for, what, 15 years? How long had she worked at this casino? She said she thought she knew it well enough. You know, she thought she knew it. She'd been watching, but she's not formally qualified for it, and she said at one time, one of the things she did was shadow her a teacher, and she thought that was adequate and would like to keep doing that. Your Honor, all the questions your Honors are asking are not . . . these are common everyday experiences that a jury ought to be able to pass on. That is . . . here's a central question in the case. Did they offer her a reasonable accommodation? I mean, it's undisputed that she offered them accommodations that would have worked. You know, she said you can move my table over to a pit that never closes. There was a pit that never closed. She offered them that. She said I would ask them about it, and she said it was like . . . she used this analogy. It's like talking about two dogs. They wouldn't respond when I would ask them, can I move my table over to a pit that doesn't close? Now, of course, she's not given her points. There was no . . . usually, you know, attendance, of course, is . . . to most, 90 percent of the employees, that's crucial. You've got to be here on time. You've got to be here every day. But this case, this casino had a system where they needed dealers to check . . . to clock out early. It wasn't a system where it was vital for them to have all dealers there all the time. Their system was we need dealers to be able to clock out early. So whether they could have . . . it was easy to make a reasonable accommodation. They could have either moved her table over to a pit . . . to a pit that doesn't close. They identified the other thing as pit one. They could just not assess her points. Why . . . why assess her points when you're having to move because of your disability? Now, Governor, you contend that she was treated differently from others with . . . Yes, sir. We think it was the issue with respect to FMLA that she would have to take that when she was forced out. Yes. She'd have to use her FMLA leave, which is uniquely harmful to her because in her health, she's got to have available FMLA hours. Otherwise, she can call in and they can say . . . she can call in sick and they say you're fired. You don't have any FMLA leave. Or you've gone over your points. So that getting that FMLA leave is vital and also getting her hours to qualify for FMLA. If she signs that EO list, she doesn't get the . . . doesn't get the work hours. She ended up with no available FMLA time. She wasn't working enough. So she was treated differently. We think the jury could also . . . it was a question for the jury as to whether all of this . . . whether they were using a pretextual reason to get rid of her. And the reason I say this is really for two reasons. Her disability was causing them an inconvenience. She goes how one of the dealers was really upset because she was getting to work the sit-down table and the other dealer wanted to work it. So it was causing them . . . you could see it was causing them some inconvenience. But second, on one particular occasion, October 22nd, she was wearing a heart monitor. And they gave her a point because they forced her home because she couldn't button her top button. She didn't go to the wardrobe person to get it fixed. She did what . . . That's your worst argument, I think. What about the situation where they made her leave because another dealer was feeling sick and wanted to sit down? I don't understand that. Counsel correctly argues that that was only half a point. In other words, what her point there was, well, I was . . . under the policy, I was the only one with an ADA disability. I was supposed to be able to use that table. The other dealer had to use the stand-up table. But he didn't . . . that one, the counsel's correct about that. It didn't matter because she only got a half a point for that. She was already over the ten anyway. She ended up with ten and a half points and saving one point wouldn't have saved her job. So they're correct about that one. But what they're not correct about, Your Honor, the factual question for the jury was, did this employer propose a reasonable accommodation? That's a fact question for the jury. And there's a second fact question for the jury. Did they discriminate against her because of her disability? I mean, those are fact questions that the jury ought to hear. Your Honor, could I . . . I'm only yelling. I'm fixing to quiet down. But just one point I'd like to make, if I could. I believe there have been worlds of law review articles on it, and I know Your Honors are all familiar with them, about how we are absolutely marginalizing the jury function. One of the reasons the public likes respect for the people or the courts, or my clients do, is the juries don't get to decide anything. You know, it's rare, it seems like it's rare for the jury to get to decide anything. We're here on such as a common, just a common thing about life. What was a reasonable accommodation for somebody at a casino in the Delta? And I, as a lawyer, don't go to casinos, and Your Honors may know it's a perfect question for the jury, is what I'm saying, Your Honor. Mr. Wade, you'll have some time on that. Thank you, Your Honor. Thank you, Your Honor. Mr. Hancock. Good morning, Your Honors. Mr. Hancock, I looked, and I'm not sure. Why do some of these jobs, you have to stand up? Why can't they all be sitting down? I know that's not an issue in this case, but I don't understand. I'll let the record speak on that, as opposed to me answering it. And Mr. Lunsford was asked that question. He is a pit boss that was, at one point, Mr. Mark's supervisor. And as he explains, the stand-up tables are the ones that fill up the most, and that receive the most business. And what the psychology underlying that is, I'm not sure I can explain it. But our business observation is that the stand-up tables, the ones where you walk up and sit a bar chair and the dealer is standing, those are the ones where business stays and where business comes first. And so those are the ones where we have, or rather, those are the tables that are provided more often. And that was the whole problem, was Mr. Mark wanted to work on this shift that transitioned into the evening. And into the evening, as we get to the later hours during that shift, people quit gambling at the sit-down table. That was the whole problem with the shift she wanted to work on, was that it ultimately closed because no one was sitting there gambling. So, Your Honor, I'm afraid I can't answer the psychology that underlies why those stand-up tables are more popular. But Mr. Lunsford did testify on the record that that is the case. Are the games the same? Well, that's a good question, too, Your Honor. Thank you. They're not all the same. Some games, like mini-bac, which is short for mini-baccarat, in fact, is always a sit-down game because of the way it's dealt. The dealer has so many things that he or she has to do that they must be seated. The same is true with, if you can picture a game of dice, a craps game. There's a pit ball sitting because that pit ball has so many things they have to control. So it is not true that all games are sit-down. Some are sit-down 24 hours. Some are stand-up and sit-down. It just varies based on business demands and what the dealer has to do. Was she treated differently with respect to having to take FMLA when she was forced out as opposed to the other people? No, Your Honor, she wasn't. One of your employees seemed to indicate that. I think actually that's a little different than what he said. That's the testimony of Kevin Munn and what Mr. Munn was asked, and this is referenced in Judge Acock's memorandum of opinion, he was asked whether other employees who had to come out on an accommodation used their FMLA. And his answer was, well, I can't think of any. Not that others weren't. He did not right offhand have a quick reference. But the reason, Your Honor, that Mr. Mark wasn't treated different than anyone else is because Horseshoe didn't mandate when she would take FMLA. She did. She had the ability to designate any absent she wanted as FMLA. And absent her decision to do that, it was not treated as FMLA. That was her alternative. She wasn't forced to do that? She was not ever forced to designate any leave as FMLA. And Your Honor, in fact, if you look in the record, there's a very thorough listing of all the absences that led to her termination. And with some of them, you'll see a designation that's FMLA E slash O. That's when she left early because she called out the FMLA. In other instances, there's just an E slash O. That's when she signed the EO list, left early, but did not receive any credit toward her FMLA. I thought she didn't have enough hours to qualify for FMLA. Well, at one point that became the case. But prior to that, she was able to take the FMLA EOs. And that did count against her FMLA, but did not count against her attendance. And that's the way the accommodation with the FMLA. She didn't get a point for that. She didn't get a point for that. Now, didn't she suggest some accommodations that were refused? But did your client show that that would have been a real hardship to make that accommodation? For example, moving a table, moving a sit down, her sit down table to another place or something like that? She did, Your Honor. In fact, she proposed two alternative accommodations. One of them was the one you referenced to move the sit down table to another pit that never closed. And the other one was that why can't I just leave and never receive an attendance point? I'll address both of them. First of all, Mr. Lunsford, I believe in his affidavit that was submitted in connection with the summary judgment filings, Mr. Lunsford points out he's a pit boss. He's a manager of the casino floor. And even he doesn't have the authority to move a table. It's a very involved process. It's very expensive. It involves a lot of analysis. And the law in the Fifth Circuit is very clear that an employer is free to choose an accommodation. And in fact, the regulations and the cases make it clear that the employer can pick the accommodation that's less expensive. And so, I'm sorry, Your Honor? I just didn't understand. And it's less expensive. And so here she did propose moving the table. But because other reasonable alternatives were proposed, the horseshoe within the rights it has under the ADAAA chose not to move that table. She also proposed that, why can't I just leave when this table closed and nobody ever give me any attendance points? Well, that's exactly what she could have done. There's no question in the record about that. All she had to do was sign the EO list. And every single day when her table closed, she'd be allowed to go home and there would be no adverse attendance ramifications whatsoever. And she tells us in the record exactly why she didn't do it. That would have meant she would be sent home early every day, wouldn't it? That's right. But she was being sent home early anyway, because the only table she could deal closed. There were no gamblers sitting at it. And so the reality is, if she wants to stay on this shift and she wants to deal at the sit-down table and that table is going to close because of business necessity, she's not ever going to get a full shift unless business dictates that we need her to stay there in that role. So her alternative, if she didn't want to change shifts and she didn't want to deal mini-bike ride, both of which were available to her, her alternative was to sign that EO list. And had she done that, Your Honor is correct, she would not have maintained her full time status and she wouldn't have continued to accrue time toward that 1,250 hours. But that's a red herring, in my opinion, Your Honor, because she wasn't accruing the requisite FMLA hours before 2009 when she asked for the accommodation. There were three instances in 2008 and 2009 where she requested FMLA leave, but she wasn't qualified. That's all before she ever even asks for an accommodation. And she continues to maintain throughout this case, and in fact, her testimony is very, very clear. I chose not to sign the EO list because I wanted to get FMLA. Well, Your Honor, I think this gets to the heart of this case or to one of the two hearts of this case. And it's a good reason why we suggest that the court should adopt the logic from Hankins versus the Gap. That's the Sixth Circuit case where Judge Moore wrote for the opinion. And in Hankins, what happened? You had a plaintiff who came in, she worked at a distribution center. She picked things and put them in boxes. And she started having performance problems and she started down this progressive discipline chain. And while she was on there, she realized, I'm going to get fired.  The Gap looked at her, said, you can go on leave of absence, but when you get back, you're going to be fired. She filed a lawsuit when she was fired and the Gap defended it and said, but she had all of these alternative accommodations available to her. We offered all of these various leaves of absence and she just didn't take them. And, Your Honors, I think you should adopt, this court should adopt the logic from Hankins. It's not really new law. It's, in fact, just common sense. And that is self-evident accommodations are not something an employer has to point out. Well, that's what we have here. Self-evident accommodations. She could have signed the EO list. She could have changed her shift. She could have learned to deal mini-BAC, all of those things. Any one of them individually or all of them collectively would have avoided the attendance problems that she instead voluntarily chose to end up with a problem. If she had signed the EO list, I'm not sure how it works. If you sign the EO list, you start out the day and you sign up that list. And so you're going along doing whatever you do and say three hours goes by and somebody at another table, I guess, the table shuts down or something. And so you get to, because you signed the EO list, you have to go and leave. Now, is that true even if your table's rocking and you're doing fine? Not necessarily. The way the EO list works is this. Employees, when they come in, before they start their shift, they sign. And then as business causes tables to slow, the pit boss may use some discretion. If you had a table full of dealers, they wouldn't, of gamblers, excuse me, they wouldn't come and pull you off that. But you would be allowed to go home in the order you signed the list as business allowed. And so, for instance, if you signed the EO list, but you were at a table and the gamblers at that table said they wanted you to stay, well, then you wouldn't go home. That business demands would keep you there. But if what happens is all. I don't understand how that works with when you have these stand up tables and sit down tables. If she signed the EO and one of the stand up tables lost business. She got to go home, even though she was a sit down person. OK. No, if she signed the EO list and her table continued to to have business, then she would likely stay at that table until that situation changed. And but if another sit down table went out of business, she that dealer would come take her place and she would go home because she had signed the early out. Technically, that could be true, except for in context here, there was no other sit down table in that pit. And so she was dealing the only one. The only I'm sorry. She was dealing the only one that dealt the game. She wanted to deal. Now, had she been qualified to deal many back, what she could have done at some point was maybe when they closed that table transition over to the many back table. But if she was the only sit down table and how could she sign early out and get the benefit of it from some other table going out of going out of business? Whether she'd get the benefit when another table closed is is a question we just don't know how to answer, because that that's not a situation that we ever encountered because she wouldn't sign the early out list. But I can tell you how it would work with her. Well, it's concerned about it is maybe visionary. I mean, I don't understand that it's a real, real valid alternative for her. If I may, your honor, I'll explain why it is the way it works is this. When she gets to work, she signs the EO list. She goes out and deals the sit down blackjack table. When the sit down blackjack table closes because her name's on the list, she goes home, but there's no attendance point. And what she wanted to do, what she wanted was to not have to sign the EO list so that Horseshoe could leave her on for a full shift. And the only way that would work is if they either made the decision to keep the table open when business did not need it or they moved it to another pit where it didn't close. And so that was a backdoor for her to request again that accommodation, that the table be moved. There must be, I mean, I asked whether there was information in the record about whether you got paid or you didn't and all that, which seems to me to be absolutely fundamental to understand the pay status of people coming and going, so to speak. But apparently there's nothing in this record. If you sign the EO thing, we don't, and they say, okay, you get to leave early, there's nothing in the record that says whether you get paid for a whole day or not if you leave early. Not sure I agree with that. I think it is in the record. And I do not believe you get paid if you leave after you are. It's got to be a pay issue. It is unpaid. It is unpaid. So that's why she didn't want to sign it. Well, interestingly, Your Honor, that's not why she didn't want to sign it. And she's very, very, very clear about this. She never mentions not wanting to sign it because it would hit home in her inability to pay bills or a financial reason. She's very clear, repeatedly in the record in her deposition, that the reason she didn't want to sign the EO list is because she thought she should be able to stay for a full shift and continue accruing hours toward her 1250 so she could get FMLA eligibility. That's where this whole problem came out, where she thought she had a right to work a full time job and get 1250 hours and continue accruing FMLA. And again, that gets to the whole issue again that is in the holding that we suggest this court should consider from the Sixth Circuit, where Judge Moore, writing for the majority, says you're not entitled to your accommodation of choice. The employer's burden, the horseshoe's burden here is to provide a reasonable accommodation. But if the employee refuses to participate in the interactive process and to become part of that reasonable accommodation or to comply with it, then they strip themselves of the protection that the 80 AAA. On the other hand, if she suggested a reasonable looking alternative, doesn't the employer have to show that it would be a hardship for him to supply that accommodation? No, Your Honor. I don't believe that is law. And I believe that again goes to the core, the very heart of the ruling in the Hankins versus the Gap case, which is not an issue this circuit has addressed. And it gets to exactly your question, Your Honor. And that is, if an employee proposes a reasonable accommodation and an employer proposes a reasonable accommodation, does the employer, are their hands bound? Do they have to take the accommodation that's proposed by the employee? And we submit that the answer is very clearly no. And it's no for a number of reasons. First of all, the regulations and the legislative intent support our position because it's very clear in 29 CFR, I believe it's 1630 little D, that the employer can implement the accommodation it wants. And in fact, it can choose the less expensive and the easier to implement. And then the second reason, Your Honor, these are businesses. And the statute was never intended to force an accommodation that was contrary to business reasons. And so this court is not, and there is a number, there's a great line of jurisprudence from this court and every other circuit that says we won't second guess HR decisions. If you provided a reasonable accommodation and you base that on your business determinations and your business judgment and it's reasonable, we won't second guess that. That's exactly where we are in this case. And that's what we submit that this court should do in this case, is look just like Judge Acock did in the court below, at the fact that Horseshoe was trying to accommodate her. There were a number of ways for Ms. DeMarc to avail herself of available opportunities. Is that that district court from New York she cited? Is that, is this the area you're talking about? No, Your Honor. I'm really referring more to the, at this point, the Hankins versus the Gap case from the Sixth Circuit. I love that case out of New York. The district court, it does suit our facts very well. I certainly agree with the positions we took in the briefs, but really where I'm arguing now is Judge Moore's opinion in Hankins versus the Gap. And I believe that case, it's just good law. There is no law anywhere, maybe one district court in the Ninth Circuit that disagrees with other district courts, but there's no law anywhere in the country that undermines Judge Moore's holding in Hankins versus the Gap. And in fact, Your Honors, we submit it's pretty good common sense. And it's simply this, if the accommodations are obvious and the employee fails to take advantage of them and then unreasonably runs into a problem like a legitimate, non-discriminatory attendance policy, well, that employee doesn't have protection under the ADAAA. And then similarly, if you have, like we do in this case, a conflict between what could be reasonable alternatives and the employee digs her heels in and unreasonably says, I won't participate in your accommodation, you are held hostage until you implement mine, that employee's not protected. And in this case, that's what Mr. Mark did, and she's not protected. Well, what happens if there's a table closes and the dealer has to be sent home but didn't sign the early out list? Does that person get a point? No, that's an FO and that is a forced out. That is that is what Mr. Mom, I believe, explains this very well. But but Mr. Mark and Mr. Lunsford talk about it as well. That's what she wanted. Well, she noticed she was forced. She didn't want a forced out. What she wanted was to be able to keep that table open and and be able to get her talking about the accommodation. I'm just talking about in reality what happens, what happens to the other dealer who has no business and they have they don't have any other skills. So that table closes, they go home, they don't get paid for the rest of the day. Do they also get a point like she got? No, and the reason is because had she had she signed the list, she would have been able to go home and say this other person didn't sign it either. And we just ran out of dealers and tables. At that point, she would be sent home without a point. That would be a forced out. That did happen to her. And if you look at her attendance record, there are examples of that. So that's an FO, Your Honor. And the problem from her standpoint with an FO had to do with her accruing the necessary time for the family, for the leave act. I mean, precisely the point she makes in her deposition, Your Honor. Any more questions from the panel? Thank you for your time. I appreciate it. We ask that you affirm Judge Acock in the court below.  Mr. Wade. Thank you, Your Honor. Your Honor, several things counsel said that I just respectfully say are just not right. He started out by saying, and I thought he was very clear about this, he said it was her choice about the FMLA, about whether it counted or didn't count against her FMLA. If a court looks at record on page 522 cited on my brief at page three, my appellate's brief, it sets out the terms of her accommodation. And here's number, it says, you've been approved for sit-down games only. When the sit-down game has closed, you will have to leave under FMLA or take a stand-up game. It's very clear. They told her you have to leave under FMLA, meaning that's going to count against your FMLA leave. That's in writing. That's what they told her. And the reason, I don't know whether I'm making this clear, but the reason she can't afford the FMLA, have it counted against her is she's in bad health. She has to take off sometimes when she's sick, and if she can't get FMLA leave, if she's out of FMLA leave, they point her. So she just can't afford to sign, I mean, signing the EO list is just another way of getting her out, because she, as your Honor said, she doesn't accumulate the hours for purposes of being covered. If she has no FMLA leave, then she gets a point. But you wouldn't have to take FMLA leave or get a point if you signed the early out list. Yes, ma'am, according to this, I'm reading from their document. But that's when she doesn't sign the list. If she signs the early out list, then they can't take, they can't make her take FMLA leave or give her a point. Right. I'm not sure about that, Your Honor. Well, that's the purpose of the list. I mean, as explained today. Let me think about this. If she signs the early out list, then the consequences are that she's not accruing time, which means she's not going to get FMLA. I understand that, but she wouldn't have to, she wouldn't get a point. I think that's right. I think she wouldn't get a point. I believe that's right. She wouldn't get a point, but. But she would suffer other consequences. The consequences are. Right, but I just would like an answer to the question. She doesn't get a point, and she wouldn't be forced to take FMLA leave if she signed the early out list. Okay, I think that's probably true, but she's still getting, she's still suffering a detriment, which other non-disabled persons aren't. The second thing, Your Honor, was the undue hardship. He, she proposed to move my table to another pit that does not close. There's a pit that doesn't close, and she proposed it. He said, well, that was an undue hardship. They didn't, the burden of proof, it's right in the statute. The burden of proof is on the employer to show undue hardship, and it's not just a subjective term. The statute defines what undue hardship is. It requires specific financial proof, goes into their net worth, and how much is it going to cost them, and all of that. They can't just say, well, it wasn't a good business decision to do that, or it's a business complexity. That's what they said, but they produced no proof that that was undue hardship. The statute says the burden of proof is on them. It sets forth like four financial criteria they have to meet to show undue hardship. So that's the third thing. Now, the last thing, and he spent a lot of time in his brief talking about this. He says, well, it's the employer's choice about what a reasonable accommodate, you know, which accommodation to give her. I accept that for purpose of argument. I don't think this circuit's ever held it, but other circuits have, accepting that, that it is the employer's choice, assuming the court would adopt that. That is not the issue. The question is whether the employer ever made a reasonable accommodation. And we suggest a jury could find the employer never proposed any reasonable accommodation, that there's no reasonable accommodation they proposed. The only reasonable accommodations she proposed and they rejected. And I've gone through the three things they suggest, but what they suggest is not in the record, or is just not supported by the record. So we'd ask the court to send this case to a jury to allow a jury to determine whether or not the employer proposed a reasonable accommodation. And we believe they did not. It's really irrelevant about whether, well, it's the employer's choice because that we never got that far. Thank you, Your Honor. Thank you, sir.